Good morning. May it please the Court, I'm Robert Jobe, and I'm appearing today on behalf of the petitioner, Saif Sayadi. In this case, the immigration judge gave no weight whatsoever to what is arguably the most important piece, single piece of evidence in the record, the expert declaration of Dr. Nabti, professor of political science and political history at Stanford University's Hoover Institution. You know, far be it from me, in particular, to suggest that anybody associated with Stanford isn't the world's greatest expert on whatever, but anybody, no matter what their credentials, has to have expertise that matters. Of course. And so you have to, don't you have to, isn't it proper for the I.J. to have looked at the proffer and said, you know, there's nothing here to substantiate any kind of opinion about current affairs or about the treatment that a Tunisian national being returned after being detained in the U.S. would be likely to encounter? Of course. And that he did. So what's wrong with that? The problem is when he did it. The problem is, in this particular case, the immigration judge waited until the evidentiary portion of the hearing had been closed in order to assess Dr. Nabti's credentials. During the evidentiary portion of the hearing, neither the immigration judge nor the government lawyer voiced any concerns whatsoever, any skepticism about Dr. Nabti's credentials. The immigration judge waited until the evidentiary record had been closed. He obviously has got a ton of credentials. But the problem, as I understood it, was with the fact that his proffer declaration was conclusory and didn't have any facts underlying it to support those two conclusions. The immigration judge essentially rejected the proffer on the grounds that Dr. Nabti had not established himself as an expert. If he were an expert, then obviously he's in a position to give opinions. But our problem with the way this case was handled by the immigration judge is that the immigration judge never gave Mr. Sayadi or his attorney an opportunity to address the concerns that he was raising with regard to the expertise of Dr. Nabti. I mean, I think we can all agree that the points that Dr. Nabti was making in his declaration are central to this case. And if you look at page 164, I think it is, of the administrative record, the witness list, it's clear that Dr. Nabti was being offered as an expert, but no one ever addressed the critical question of whether he was going to be treated as an expert until the evidentiary record had been closed. And in our view, that's just not fair. I mean, why is that the I.J.'s responsibility? If you had chosen to have the witness testify live, there might have been cross-examination, might have focused on things. What I look at here is a one-page sworn statement that's completely conclusory and, frankly, I don't find very persuasive. Basically, trust me, this is the bottom line, end of story. And I have difficulty with the notion that the I.J. is compelled to trust him, end of story, or is compelled to give notice to a lawyer. You know, Mr. Lawyer, your case isn't very persuasive. You better produce some more evidence so you can persuade me. I mean, the case is over. He can decide. Yeah. On that question about why Dr. Nabti was not in court, I mean, I think when you look through the record, it's clear that the immigration judge was telling counsel. Well, it's a reason given, but that doesn't make much of a record for this case and doesn't help us. No, but my point is different, Your Honor. My point is that throughout this hearing, the immigration judge was telling counsel for Mr. Sayati to bring in a statement. I mean, let me just run through the record real quickly on this point because I think it's an important point. And I would agree with you that he should have been here and the government should have had the opportunity to cross-examine. I think what happened here is the judge made two errors. He affected both parties, the government and the alien in this particular case. He denied the alien an opportunity to address his concerns with regard to the expertise of his witness. And he denied the government an opportunity to cross-examine Dr. Sayati. Both were erroneous, and that's why I think a remand is necessary in this particular case. But at the outset here, at the beginning of the hearing, let's see here, October 15, 2002, and this is on page 114, counsel for Mr. Sayati indicated his intention to present Dr. Sayati as a witness, but he said that Dr. Sayati is not going to be available until March or later because he's going to be out of the country. And he asked that the hearing be set out until after March. The judge denied that request, but said what we'll do is we can convene. We'll take testimony from your client and then continue at that point. How would that be? So they left this hearing in October 2002 with the understanding that they were going to take testimony from Mr. Sayati and the expert's testimony would come in later. So they come to the next hearing on January 9th, and obviously, as agreed, Dr. Sayati's or Dr. Napti's not there. And at that time, Roger Kubain, the attorney for Mr. Sayati, pointed out that Dr. Napti had recently testified and he asked to incorporate his testimony into the record. At that point, and this is on page 120 of the administrative record, the I.G. denies that request to incorporate the testimony from the previous day, but he says we could, quote, we could certainly allow some time to submit a statement, unquote. There's no talk from the immigration judge about bringing in the witness. He's talking about bringing in a statement. The trial attorney responds by saying I'm not opposed to keeping the record open for a brief time to receive the statement. However, I can say right now that we would be opposed and we would object if he's not going to come in and be subject to cross-examination. And then on page 142 of the record, the immigration judge goes back to this point at the close of the record, and this is what he says, and I think this is very important. He said that he was going to, quote, leave the record open, unquote, so that Mr. Sayati would be, quote, afforded an opportunity to submit a statement. Again, the immigration judge is telling him, submit the statement. Submit a statement from Dr. Napti. So when they come back to court on January 21st, he submits the statement, as the immigration judge had asked him to do. And obviously, as he'd indicated throughout, he's expecting or he's proffering this testimony as an expert. And I agree there are some deficiencies in the manner in which it was presented. But the bottom line is here, he's offering expert testimony, which is central. It's central to the issues that are arising in this case. And no one ever questioned the expertise of Dr. Napti until the evidentiary record has closed. Now, from our perspective, in these asylum proceedings, an applicant has to have an opportunity to address the immigration judge's concerns before the evidentiary record is closed. I mean, if we're dealing with credibility of the asylum applicant, for example, and there are discrepancies that arise, this Court has held that we can't rely on apparent discrepancies, that the applicants never had an opportunity to explain. Similarly, in the terms of corroboration, if the immigration judge is going to fault an asylum applicant for failing to present corroboration, he can only do so if he gives the applicants an opportunity to explain the failure to present that corroboration. Now, here we have a very similar situation where it works. Robert, I think I understand the points you're making. And it would have been far better had the IJA managed this in a slightly different way. Of course. But assuming that the statement comes in, what it says is that in certain circumstances, the Tunisian government will arrest people who have been arrested abroad for suspicious of engaging in Islamic activities, and such persons, it's quite fair to say such persons, are subject to detention and fairly severe adverse treatment. Right. If we accept that that's true, if we have that in the record, the testimony by your client hardly puts him in a position to qualify as such a person. Well, I would disagree with that, Your Honor. I mean, what he said is that, first off, that there's a longstanding policy of sharing information between the United States and Tunisia about persons arrested in those respective countries first. Sure. But even if he's arrested in this country and that information is shared, we know he's arrested. We're not sure, but let's assume that the information is shared. There's nothing in the record here to tell me that he's arrested here and that there is real suspicion by the United States authorities that he's engaged in Islamic activities. Well, we know that he was seized by the FBI, but that's not what Dr. Nabti's statement says. His statement says that persons who have been arrested while living abroad as part of an investigation into Islamic movements in the host country, upon return, are subject to immediate arrest, detention, et cetera. This is somebody who fits that profile. He clearly fits that profile. And on this point about whether the Tunisian government is aware, I do want to address that very briefly, because at this point it's undisputed that we have a treaty with Tunisia. The government conceived this in footnote 4, page 18 of its brief, that under that treaty, Article 39 of the treaty, which has been in effect since 1994, the United States has an obligation, a legal obligation by treaty to inform the Tunisian government whenever one of its citizens is detained. Now, the government's taking the position that in this case, evidently they're taking the position that they violated that treaty obligation. Well, in our view, the immigration judge put the burden on Mr. Sayadi to establish that, in fact, the government had complied with the law. In our view, that's wrong. Because there's a binding treaty obligation on the United States government to inform the Tunisian government whenever one of its citizens is arrested, we have to presume that the FBI agents who arrested Mr. Sayadi were complying with the law. We can't presume that they were not complying with the law. And so in our view, the burden of proof on that question should have rested with the government. I realize you're over time, but let me pose one additional question on a slightly different subject. Yes, Your Honor. Is it the case that your client was granted voluntary departure conditioned upon posting a bond of, I think, $500, and then thereafter chose not to post the bond or did not post the bond? He was unable to post the bond. Under the current rules, it's required, if you're going to be granted voluntary departure, that you post a minimum $500 bond. And in this particular case, he was unable to do so within the necessary five days. And so his voluntary departure has lapsed. So if he's removed, he'll be deported. Thank you, Your Honor. Excuse me. Thank you, Mr. Job. Mr. Davies. May it please the Court. Mark Davies for the United States. This issue really focuses on the standards of proof and the standards of review. Mr. Sayadi overstayed his visa. He concedes that he's eligible to be deported. So under the law that Congress has set forth, it's his burden to establish entitlement to asylum, and there's just — he just didn't meet that burden. And, of course, the question for this Court is whether the immigration judge was correct in so concluding. And as the conversation that's preceded me has pointed out, the main thing he has going for him is this — it's certainly not his own testimony. As Judge Fletcher was pointing out, he really hasn't connected up his theory of the case that there are problems in Tunisia with himself. He hasn't made the connection between — Well, the factual question that appears to turn on, at least in some significant part, is whether the Tunisian authorities would perceive him coming back as under a cloud. And in particular, whether whatever happened when he was detained and questioned in June or the summer of 2002 is something that would be a big black mark on his record when he comes back. And as to that, I understand that immigration court proceedings, they're dealing with volume and so forth, or maybe the record is sometimes just what it is. But in this case, I look to try to figure out what there is to support the proposition that the Tunisian authorities would not have been notified of his detention. And in terms of real evidence, I don't find anything. I do find a statement by the attorney as to his — an attorney non-sworn type statement, but presumably intended to be a straightforward description to the Court, about the attorney's discussions with a couple of the agents. But it's all real murky, and it's about as murky here as the problem that Petitioner has with this expert. What are we supposed to do with that? I mean, is there anything else we can point to that says with confidence or gives a reason to think the I.J. had a basis for saying that the Tunisian authorities would not be notified or had not been notified? I mean, I think that Your Honor puts it well. I would only add that the State Department guidance documents and the regulations of the Department of Homeland Security, those two formal documents, those are the documents that I think it's fair for a court to assume are going to be guiding the behavior of people in the field. I mean, those are the manuals that people look to when they make an arrest. What do we have to do? And that's just the reality. And both the regulation and the State Department guidance are clear that Tunisia is not a mandatory reporting country. It should have been, but apparently the timeline wasn't listed. It wasn't listed. And, you know, as you said, you know, there's often gaps and murkiness and all this. But I think you can take a lot of confidence from the fact, you know, that the relevant documents in front of the relevant people omitted Tunisia. And that's not indisputant. It's just not in dispute. Now, you know, it shouldn't have. And, you know, hopefully in the future it won't. But for purposes of here, of having confidence about what happened, you have that additional support. And, of course, you do have the fact that the lawyer talked to the agents, and it's not sworn testimony, of course, although he did later submit a sworn declaration to that effect, that the lawyer in the motion to reopen submitted a declaration. But I think it's telling, though, that the, you know, the lawyer for the claimant was not jumping up and down and not trying to bring in the agents. It really wasn't disputed that, you know, the attorney had talked to the agents and this is what they'd said. He wasn't going to stipulate to it. But I think this is sort of real-world consequences of what was going on. Again, that sort of supports what the immigration judge found. And to the extent, of course, it's a factual finding, it's obviously highly deferential review. And, you know, like you said, these are high-volume cases. We're not going to have everything as perfect as you would in a regular district court proceeding. But, you know, that's where we are. I should know this, but I don't. As I read the footnote 4 and so on, it looks as though this is an obligation at least comparable to the Vienna Convention. Is this the Vienna Convention itself or is it simply an analogous obligation undertaken between this government and Tunisia? At the very edges of my knowledge here, Your Honor, but I've seen an agreement that specifically is between Tunisia and this country. I don't know whether it's set up by reference or like it's independent, but it's not some sort of general obligation we're pointing to. It's specifically with Tunisia. And that is our obligation.  It's just what happened. You know, I would only add to the discussion of Dr. Nabti that came before, is that I think all the immigration judge was saying is that there's just been no foundation laid for this expert testimony. What he wasn't saying, as Your Honor has noticed, he wasn't saying he's never an expert on any topic. You know, he's some sort of like, you know, mail order Ph.D. type. It's just that there was no reason to believe he knew anything specific about Tunisia or any issues in this case. And that's why at times the immigration judge said, look, you know, I know what he's going to say. It's just not going to add anything. And it's also, you know, he admitted the statement. He didn't say, okay, I'm not going to hear it. He admitted it and he just said, well, you just haven't advanced what we need to know here. You've just sort of asserted conclusively that these regulations are complied with, although telling you he doesn't even refer to the regulations. He shows no indication that he's aware of the guidance documents that are relevant, the relevant regulations. And so it's just, it's just by caveat. And I think the, you know, by assertion. And the immigration judge just said that's just not, it's not enough. It's not enough when it's your burden to come forward with evidence to, you know, to connect, to establish the possibility, the real possibility of persecution. Are there no further questions? Thank you. Roberts. If I could just very briefly address the notification requirement, because, again, it's undisputed at this point that there was a treaty in effect and the United States had a legal obligation to inform the Tunisian government of Mr. Seade's arrest. And what the government is doing is they're essentially putting the burden on us to establish that they complied with the law. I think that burden of proof question is, they're wrong on that burden of proof question. But the other part of it is we need to remember this was a joint operation between the FBI and the INS. And we have some secondhand statements from two INS officers, but we have nothing from the FBI. And we have to presume as a legal matter that the FBI complied with its legal obligations and informed the Tunisian government of its arrest of Mr. Seade. Thank you. All right. Thank you, counsel. The matter just argued will be submitted.
judges: Rymer, W. Fletcher, Clifton